**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| **MARK SCHOTT on his own behalf and all others similarly situated,**<br><br>**Plaintiff,**<br>**v.**<br><br>**MARQUIS SOFTWARE SOLUTIONS, INC. and FIRST NATIONAL BANK OF PENNSYLVANIA,**<br><br>**Defendants.** | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Mark Schott ("Plaintiff") brings this Class Action Complaint against Marquis Software Solutions, Inc., ("Marquis") and First National Bank of Pennsylvania ("FNB") (together "Defendants"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and his counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. Entities that provide services and handle customers' and employees' sensitive personal identifiable information (defined below) owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII to unauthorized persons, especially hackers with nefarious intentions, will result in harm to the affected individuals, including, but not limited to, the invasion of their private financial matters.

2. Plaintiff brings this class action against Defendants for its failure to properly secure and safeguard personal identifiable information ("PII" or "Private Information")[1] of

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

potentially several hundred thousand individuals, including, but not limited to, name, date of birth, federal/state identification numbers, tax identification number, social security number and/or financial account information, and other information such as phone number, address, and email address.

3. On November 25, 2025, Marquis announced that it "identified suspicious activity on our network and later determined that it was the result of a cybersecurity incident."[2]

4. Marquis is "a digital and physical marketing and communications vendor for various financial institutions in the United States, including First National Bank of Pennsylvania."[3]

5. According to Marquis the breach occurred on or about August 14, 2025 (the "Data Breach"), however, Marquis delayed over 3 months to provide any notice to those affected by the Data Breach, including Plaintiff and Class members.

6. According to the Breach Notice "Our investigation determined that an unauthorized third party accessed our network and may have accessed and acquired certain files from our systems."[4]

7. Additionally, according to the Breach Notice it provided to Maine's Attorney General, the information involved includes customers' "names, addresses, phone numbers, Social Security numbers, Taxpayer Identification Numbers, financial account information without security or access codes, and dates of birth."[5]

8. Marquis contracts with FNB to provide marketing and compliance solutions.[6]

9. The Breach Notice further states that Plaintiff's personal information, specifically,

---

[2] *See* Breach Notice, attached as Exhibit "A."
[3] *Id.*
[4] *Id.*
[5] *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2eb0a98c-c8e9-4d35-bc72-c4e68f5eebb9.html (last visited December 8, 2025).
[6] https://gomarquis.com/who-we-are/about-us (last visited December 8, 2025).

"*name, Date of Birth, and Social Security Number*" were included in the Data Breach.[7]

10. Prior to and through August 14, 2025, Defendants obtained the Plaintiff's and Class members' PII, including by collecting it directly from Plaintiff and Class Members.

11. Prior to and through August 14, 2025, Defendants stored Plaintiff's and Class members' PII unencrypted, in an Internet-accessible environment on Defendants' network.

12. On or around November 25, 2025, Defendants began notifying Plaintiff and Class members of the Data Breach.

13. By obtaining, collecting, using, and deriving a benefit from the Plaintiff's and Class members' PII, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. Defendants admit that the unencrypted PII that was accessed and/or acquired by an unauthorized actor included name, date of birth, driver's license number, federal/state identification card number, tax identification number, social security number and/or financial account information, and other information such as phone number, address, and email address.

14. Plaintiff's and Class members' exposed PII can be sold on the dark web. Hackers can access and then offer for sale the un-encrypted, unredacted PII to criminals. Plaintiff and Class members now face a lifetime risk of (i) identity theft, which is heightened here by the loss of Social Security numbers, and (ii) the sharing and detrimental use of their sensitive information.

15. The PII was compromised due to Defendants' negligent and/or careless acts and omissions and the failure to protect the Plaintiff's and Class members' PII. Defendants have also purposefully maintained secret the specific vulnerabilities and root causes of the breach and have not informed Plaintiff and Class Members of that information.

---

[7] *Id.* n.2, *supra*. (emphasis added).

16. Prior to receiving notification, Plaintiff and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm, including the sharing and detrimental use of their sensitive information. The risk will remain for their respective lifetimes.

17. Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect the Plaintiff's and Class members' PII; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts to negligence and violates federal and state statutes.

18. Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the disclosure of their private information, and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII.

19. Defendants disregarded Plaintiff's and Class members' rights by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff's and Class members' PII was safeguarded, failing to take

available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, Plaintiff's and Class members' PII were compromised through disclosure to an unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

20. On behalf of himself and the Class as defined herein, Plaintiff brings claims for negligence, breach of fiduciary duty, breach of confidence, breach of express contract, breach of implied contract, and, in the alternative to their contract-based claims, unjust enrichment. The remedies Plaintiff seeks include actual, nominal, and putative damages; appropriate injunctive and declaratory relief; and attorneys' fees, costs, and expenses.

## II. PARTIES

21. Plaintiff Mark Schott is an adult individual and, at all relevant times herein, a resident and citizen of Pennsylvania, residing in Frackville, Pennsylvania. At all relevant times, Plaintiff Schott maintained various bank accounts with FNB and is a Marquis customer and a Data Breach victim.

22. Plaintiff Schott received the letter notifying him of the breach, via email, directly from Defendants dated November 25, 2025.

23. Defendant Marquis Software Solutions, Inc. is a Texas corporation with a principal place of business at 5208 Tennyson Parkway, Plano, Texas, 75024.

24. According to its website, Marquis provides "marketing and compliance software and services provider that specializes in banks and credit unions. Our marketing and compliance solutions include CRM software systems, marketing data platforms, compliance data platforms,

cloud services, digital communications, conversational analytics, web design & technology, and more."[8]

25. Defendant First National Bank of Pennsylvania is a Pennsylvania nonprofit corporation headquartered in Pittsburgh, Pennsylvania.

26. According to FNB's website, the company was established in 1969 and maintains "$50 billion assets and approximately 350 banking offices with operations throughout Pennsylvania, Ohio, Maryland, West Virginia, North Carolina, South Carolina, Virginia and the District of Columbia."[9]

27. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

28. All of Plaintiff's claims stated herein are asserted against Defendants and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## III. JURISDICTION AND VENUE

29. This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendants to

---

[8] https://gomarquis.com/what-we-offer/customer-data-platform/crm (last visited December 8, 2025).
[9] https://www.fnb-online.com/about-us/corporate-information/corporate-overview#:~:text=District%20of%20Columbia.-,FNB%20provides%20a%20full%20range%20of%20commercial%20banking%2C%20consumer%20banking,of%20Pennsylvania%2C%20founded%20in%201864 (last visited December 8, 2025).

establish minimal diversity.

30. This Court has personal jurisdiction over the parties in this case. Defendants conduct business in this District and are citizens of this District by virtue of having its principal place of business located in this District.

31. Venue is proper in this District under 28 U.S.C. §1391(b) because Defendants maintain a headquarters in this District and regularly conduct business in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Defendants collecting and/or storing the Plaintiff's and Class members' PII.

## IV. FACTUAL ALLEGATIONS

***Background***

32. Defendants collected Plaintiff's and Class members' PII and stored it, unencrypted, on Defendants' internet-accessible network.

33. Plaintiff and Class members relied on these sophisticated Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PII.

34. Defendants had a duty to adopt reasonable measures to protect the Plaintiff's and Class members' PII from involuntary disclosure to third parties.

***The Data Breach***

35. As above, on or about August 14, 2025, Defendants experienced a data breach when Marquis "detected a ransomware attack on August 14, 2025, traced to unauthorized access through its SonicWall firewall."[10]

[10] https://securityaffairs.com/185320/data-breach/marquis-data-breach-impacted-more-than-780000-individuals.html (last visited December 8, 2025).

36. According to cybernews sources, the Akira ransomware group accessed and exfiltrated Plaintiff's and Class members' PII and demanded a ransom.[11]

37. On November 25, 2025, after delaying over 3 months, Defendants emailed a Notice of Data Breach informing Plaintiff and other Class members their PII among the data exfiltrated as part of the Data Breach.

38. Defendants admitted in the Notice of Data Breach that an unauthorized actor accessed sensitive information about Plaintiff and Class Members, including names, dates of birth, social security number and financial payment information.

39. Presently, however, Defendants have provided no public information on a ransom demand or payment.

40. On information and belief, Plaintiff's and the Class's stolen PII has now been published by cybercriminals to the Dark Web as that is the modus operandi of ransomware attackers.[12]

41. As the Harvard Business Review notes, "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[13]

42. The details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiff and Class Members, who retain a vested interest in ensuring that their

[11] *Id.*, *see also* nn.2-5, *supra*.
[12] https://www.paloaltonetworks.com/cyberpedia/what-is-multi-extortion-ransomware (Typically, in a ransomware attack, the criminal actor will not only encrypt the victim's system and block access until a ransom is paid but also exfiltrate data and threaten to release it to the dark web if a ransom is not paid. This scheme is known as a double-extortion attack. This scheme is used because many "organizations overcome the threat of file encryption with a simple up-to-date backup system.").
[13] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

information remains protected.

43. The unencrypted Plaintiff's and Class members' PII may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class members' PII.

44. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiff and Class Members, causing the exposure of PII for Plaintiff and Class Members.

45. Because Defendants had a duty to protect Plaintiff's and Class Members' PII, Defendants should have accessed readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

46. In the years immediately preceding the Data Breach, Defendants knew or should have known that Defendants' computer systems were a target for cybersecurity attacks because warnings were readily available and accessible via the internet.

47. In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[14]

48. In tandem with the increase in data breaches, the rate of identity theft complaints have also increased over the past few years. For instance, in 2017, 2.9 million people reported

[14] FBI, High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations (Oct. 2, 2019) (emphasis added), available at https://www.ic3.gov/Media/Y2019/PSA191002 (last visited December 8, 2025).

some form of identity fraud compared to 5.7 million people in 2021.[15]

49. According to the Identity Theft Resource Center, during 2025, thus far, (H1), there were "1,732 data compromises, affecting 165,745,452 individuals."[16] This represents a significant increase over the same period of 2024 (H1).[17]

50. The type and breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendants' customers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

51. Private Information is a valuable property right.[18] The value of Private Information as a commodity is measurable.[19] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[20] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[21] It is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber

---

[15] Facts + Statistics: Identity Theft and Cybercrime, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-andcybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Apr. 27, 2023).

[16] https://www.idtheftcenter.org/publication/itrc-h1-2025-data-breach-report/ (last visited Apr. 27, 2023).

[17] *Id.*

[18] See Marc Van Lieshout, The Value of Personal Data, 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . . ").

[19] Robert Lowes, Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[20] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-andtechnology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[21] U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

black-market," or the "dark web," for years afterwards.

52. As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, Private Information, and other sensitive information directly on various internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

53. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "***[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies***. They breach networks, use specialized tools to maximize damage, ***leak corporate information on dark web portals***, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[22]

54. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that ***"[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data*** if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[23]

55. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on

[22] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), available at https://www.zdnet.com/article/ransomware- mentioned-in-1000-sec-filings-over-the-past-year/ (last visited December 8, 2025).
[23] U.S. CISA, Ransomware Guide–September 2020, available at https://www.cisa.gov/stopransomware/ransomware-guide (last visited April 21, 2023).

the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

56. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

57. Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, open new utility accounts, and incur charges and credit in a person's name.

58. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove

fraudulent charges from their accounts, placing freezes on their credit, and correcting their credit reports.

59. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, “[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it” to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver’s license or ID, and/or use the victim’s information in the event of arrest or court action.

60. Identity thieves can also use the victim’s name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim’s information. In addition, identity thieves may obtain a job using the victim’s Social Security number, and/or rent a house or receive medical services in the victim’s name.

61. Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

62. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies

confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[24]

63. This readily available and accessible information confirms that, prior to the Data Breach, Defendants knew or should have known that (i) cybercriminals were targeting big companies such as Defendants, (ii) cybercriminals were ferociously aggressive in their pursuit of big companies such as Defendants, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

64. In light of the information readily available and accessible on the internet before the Data Breach, Defendants, having elected to store the unencrypted Plaintiff's and Class members' PII in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendants' type of business had cause to be particularly on guard against such an attack.

65. Prior to the Data Breach, Defendants knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack.

66. Prior to the Data Breach, Defendants knew or should have known that it should have encrypted the Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Defendants Acquires, Collects, and Stores the Plaintiff's and Class members' PII.***

67. Defendants acquired, collected, and stored the Plaintiff's and Class members' PII.

68. By obtaining, collecting, and storing the Plaintiff's and Class members' PII,

---

[24] Janice Y. Tsai et al., The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.guanotronic.com/~serge/papers/isr10.pdf.

Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

69. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

70. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[25]

71. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

a. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d. Configure firewalls to block access to known malicious IP addresses.

---

[25] See How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for- cisos.pdf/view (last visited December 8, 2025).

e. Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f. Set anti-virus and anti-malware programs to conduct regular scans automatically.

g. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h. Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

j. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

k. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

l. Execute operating system environments or specific programs in a virtualized environment.

m. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

72. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[26]

---

[26] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), available at

73. Given that Defendants was storing the PII of potentially millions of individuals, Defendants could and should have implemented all the above measures to prevent and detect ransomware attacks.

74. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the PII of potentially millions of individuals, including Plaintiff and Class members.

***Securing PII and Preventing Breaches***

75. Defendants could have prevented this Data Breach by properly securing and encrypting the folders, files, and or data fields containing the Plaintiff's and Class members' PII. Alternatively, Defendants could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

76. Defendants' negligence in safeguarding the Plaintiff's and Class members' PII is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

77. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Plaintiff's and Class members' PII from being compromised.

78. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[27]

---

https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited December 8, 2025).

[27] 17 C.F.R. § 248.201 (2013).

The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[28]

79. The ramifications of Defendants' failure to keep secure the Plaintiff's and Class members' PII are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

***Value of Personal Identifiable Information***

80. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[29] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[30] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[31]

81. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information

---

[28] *Id.*

[29] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited December 8, 2025).

[30] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask- experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark- web/ (last visited December 8, 2025).

[31] *In the Dark*, VPN Overview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited December 8, 2025.

compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

82. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[32]

83. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

84. The fraudulent activity resulting from the Data Breach may not come to light for years.

85. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

86. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Plaintiff's and Class members' PII, including Social Security numbers, and of the foreseeable consequences that would occur if Defendants' data security

---

[32] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit CardNumbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited December 8, 2025).

[33] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited December 8, 2025).

system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

87. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

88. Defendants were, or should have been, fully aware of the unique type and the significant volume of data contained in Defendants' database, amounting to potentially millions of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

89. To date, Defendants have offered Plaintiffs and Class Members 12 months of complimentary credit monitoring and identify protection services through Single Bureau Credit Monitoring/Single Bureau Credit Report/Single Bureau Credit Score Services. The offered service is inadequate to protect Plaintiff and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

90. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Plaintiff's and Class members' PII.

***Plaintiff's Mark Schott's Experience***

91. Plaintiff Mark Schott maintained personal banking accounts or obtained loans or other services from Defendants or its affiliate prior to the Data Breach and received Defendants' Notice of Data Breach, dated November 25, 2025, on or about that date. *See* Exhibit "A."

92. As a result of the Data Breach, Plaintiff's sensitive information was accessed and/or acquired by an unauthorized actor. The confidentiality of Plaintiff's sensitive information

has been irreparably harmed. For the rest of his life, Plaintiff will have to worry about when and how his sensitive information may be shared or used to his detriment.

93. As a result of the Data Breach notice, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

94. Since the Data Breach, Plaintiff Schott has tried to mitigate the damage by changing his passwords, contacting the credit bureaus, and monitoring his financial accounts for and spent several hours on these activities. This is more time than he spent prior to learning of the Defendants' Data Breach. Having to do this every week not only wastes his time as a result of Defendants' negligence, but it also causes him great anxiety.

95. Soon after the Data Breach, Plaintiff Schott began receiving an excessive number of spam calls on the same cell phone number provided to Defendants on his records. These calls are a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that the calls are related to his stolen PII.

96. Additionally, Plaintiff is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

97. Plaintiff stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

98. Despite his best efforts, Plaintiff has suffered numerous occurrences of fraudulent activity including fraudulent bank charges using his personal information that was taken from Defendants.

99. Defendants' data security shortcomings resulted in the Data Breach and caused Plaintiff significant injuries and harm in several ways. For example, Plaintiff has devoted and will continue to devote significant time, energy, and money to: closely monitoring his bills, records, and credit and financial accounts; changing login and password information on any sensitive account; carefully screening and scrutinizing phone calls, emails, and other communications to ensure that he is not being targeted by identity theft scams, medical identity theft scams, or other attempts at fraud; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect himself; and placing fraud alerts and/or credit freezes on their credit file. Plaintiff has taken or will be forced to take these measures to mitigate his potential damages because of the Data Breach.

100. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

101. Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

102. Plaintiff Schott is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendants' Data Breach.

103. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

104. Plaintiff has experienced anxiety and increased concerns arising from the fact that his PII has been or will be misused and from the loss of his privacy.

105. The risk is not hypothetical. Here, a known hacker intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive information, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

106. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII, a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and because of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

107. Plaintiff has a continuing interest in ensuring that his PII which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

108. Had Plaintiff Schott been aware that Defendants' computer systems were not secure, he would not have entrusted Defendants with his PII and PHI.

**Plaintiff's and Class Members' Common Injuries**

109. To date, Defendants have done absolutely nothing to compensate Plaintiff and Class members for the damages they sustained in the Data Breach.

110. Furthermore, Defendants' failure to safeguard Plaintiff's and Class members' Private Information, places the burden squarely on Plaintiff and the Class, rather than on the Defendants, to investigate and protect themselves from Defendants' tortious acts and omissions resulting in the Data Breach.

111. Plaintiff and Class members have been damaged by the compromise and

exfiltration, by cybercriminals, of their Private Information as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

112. Plaintiff and Class members were damaged in that their Private Information is now in the hands of cybercriminals being sold and potentially for sale for years into the future.

113. As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft, especially in light of the actual fraudulent misuse of the Private Information that has already taken place, as alleged herein.

114. As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have been forced to expend time dealing with the effects of the Data Breach.

115. Plaintiff and Class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, for medical care and services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

116. Plaintiff and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class members.

117. Plaintiff and Class members also suffered a loss of value of their Private Information when it was acquired by cyberthieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

118. Plaintiff and Class members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

119. Plaintiff and Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Monitoring their medical records for fraudulent charges and data;

e. Addressing their inability to withdraw funds linked to compromised accounts;

f. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g. Placing "freezes" and "alerts" with credit reporting agencies;

h. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i. Contacting financial institutions and closing or modifying financial accounts;

j. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l. Closely reviewing and monitoring bank accounts and credit reports for

unauthorized activity for years to come.

Moreover, Plaintiff and Class members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

120. Further, as a result of Defendants' conduct, Plaintiff and Class members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

121. Defendants' delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendants knew of the breach ***since August 2025*** and failed to notify those affected until ***November 25, 2025***, including Plaintiff and Class members. Defendants offered no explanation of purpose for the delay.

## V. CLASS ACTION ALLEGATIONS

122. Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

123. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All persons in the United States and its territories whose PII was compromised in the Data Breach, including all individuals who received a data breach notification

letter from Defendants. (the "Nationwide Class").

124. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

125. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

126. <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Class are so numerous that joinder of all members is impracticable. Defendants reported that more than 33 terabytes of customer account information and transactions[34] was impacted in the Data Breach, and the Class are apparently identifiable within Defendants' records.

127. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include *inter alia*:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' Private Information from unauthorized access and disclosure;

b. Whether Defendants' actions and its allegedly lax data security practices used to protect Plaintiff's and class members' PII violated the FTC Act and/or other state

---

[34] *See* https://www.securityweek.com/evolve-bank-data-leaked-after-lockbits-federal-reserve-hack/ (last visited December 8, 2025).

laws and/or Defendants' other duties alleged herein;

c. Whether Defendants failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and class members;

d. Whether Plaintiff and class members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

e. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and class members' PII;

f. Whether an implied contract existed between class members and Defendants providing that Defendants would implement and maintain reasonable security measures to protect and secure class members' PII from unauthorized access and disclosure;

g. Whether an express contract existed between class members and Defendants providing that Defendants would implement and maintain reasonable security measures to protect and secure class members' PII from unauthorized access and disclosure;

h. Whether Plaintiff and class members are intended third party beneficiaries of contracts between Defendants and third parties, and if so whether Defendants breached those contracts;

i. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and class members;

j. Whether Defendants' actions and inactions alleged herein constitute gross negligence;

k. Whether Defendants breached its duties to protect Plaintiff and class members' Private Information; and

l. Whether Plaintiff and all other members of the Class are entitled to damages and the measure of such damages and relief.

128. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of himself and all other class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

129. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendants' misfeasance.

130. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

131. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff received the notification

of the data breach and has experienced actual damages as a result of the breach. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

132. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

133. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action

alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

134. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

135. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

136. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to class members' names and addresses affected by the Data Breach. Indeed, class members have already been preliminarily identified and sent notice of the Data Breach.

137. Unless a Class-wide injunction is issued, Defendants may continue in its failure to properly secure the PII of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

138. Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

139. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b. Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c. Whether Defendants failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendants on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e. Whether Defendants breached the implied contract;

f. Whether Defendants adequately and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Plaintiff's and Class members' PII; and,

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## COUNT I
## NEGLIGENCE
## (On Behalf of Plaintiff and the Class)

140. Plaintiff realleges and incorporates by reference all the preceding allegations above as if fully alleged herein.

141. Defendants have full knowledge of the sensitivity of the PII and the types of harm

that Plaintiff and the Nationwide Class could and would suffer if the PII was wrongfully disclosed.

142. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Nationwide Class involved an unreasonable risk of harm to Plaintiff and the Nationwide Class, even if the harm occurred through the criminal acts of a third party.

143. Defendants had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendants' security protocols to ensure that the PII of Plaintiff and the Nationwide Class in Defendants' possession was adequately secured and protected.

144. Defendants also had a duty to exercise appropriate clearinghouse practices to remove from an Internet-accessible environment the PII it was no longer required to retain pursuant to regulations and had no reasonable need to maintain in an Internet-accessible environment.

145. Defendants also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiff and the Nationwide Class.

146. Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiff and the Nationwide Class. That special relationship arose because Defendants acquired Plaintiff and the Nationwide Class's confidential PII in the course of its business practices.

147. Defendants was subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Nationwide Class.

148. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Nationwide Class was reasonably foreseeable, particularly in light of Defendants' inadequate

security practices.

149. Plaintiff and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Nationwide Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendants' systems.

150. Defendants' own conduct created a foreseeable risk of harm to Plaintiff and the Nationwide Class. Defendants' misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included its decisions not to comply with industry standards for the safekeeping of the PII of Plaintiff and the Nationwide Class, including basic encryption techniques freely available to Defendants.

151. Plaintiff and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

152. Defendants was in a position to protect against the harm suffered by Plaintiff and the Nationwide Class as a result of the Data Breach.

153. Defendants had and continue to have a duty to adequately disclose that the PII of Plaintiff and the Nationwide Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Nationwide Class to (i) take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties and (ii) prepare for the sharing and detrimental use of their sensitive information.

154. Defendants had a duty to employ proper procedures to prevent the unauthorized

dissemination of the PII of Plaintiff and the Nationwide Class.

155. Defendants have admitted that the PII of Plaintiff and the Nationwide Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

156. Defendants, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Nationwide Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiff and the Nationwide Class during the time the PII was within Defendants' possession or control.

157. Defendants improperly and inadequately safeguarded the PII of Plaintiff sand the Nationwide Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

158. Defendants failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiff and the Nationwide Class in the face of increased risk of theft.

159. Defendants, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and the Nationwide Class by failing to have appropriate procedures in place to detect and prevent dissemination of the PII.

160. Defendants breached its duty to exercise appropriate clearinghouse practices by failing to remove from the Internet-accessible environment any PII it was no longer required to retain pursuant to regulations and which Defendants had no reasonable need to maintain in an Internet-accessible environment.

161. Defendants, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and the Nationwide Class the existence and scope of the Data Breach.

162. But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and the Nationwide Class, the PII of Plaintiff and the Nationwide Class would not have been compromised.

163. There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and the Nationwide Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Nationwide Class. The PII of Plaintiff and the Nationwide Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

164. As a direct and proximate result of Defendants' negligence, Plaintiff and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII of Plaintiff and the Nationwide Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Nationwide Class.

165. As a direct and proximate result of Defendants' negligence, Plaintiff and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

166. Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

167. As a direct and proximate result of Defendants' negligence, Plaintiff and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT II**
**BREACH OF EXPRESS CONTRACT**
**(On behalf of Plaintiff and the Class)**

168. Plaintiff realleges and incorporates by reference all the preceding allegations above as if fully alleged herein.

169. Plaintiff and Class members entered into a valid and enforceable contract through which they paid money to Defendant in exchange for services. That contract included promises by Defendant to secure, safeguard, and not disclose Plaintiff's and Class members' Private Information.

170. Defendant's Privacy Policy memorialized the rights and obligations of Defendant and its customers, beneficiaries, employees, agents, and other individuals in its U.S. business. This document was provided to Plaintiff and Class members in a manner in which it became part of the agreement for medical care and services.

171. In the Privacy Policy, Defendants commits to protecting the privacy and security of private information and promises to never share Plaintiff's and Class members' Private Information except under certain limited circumstances.

172. Plaintiff and Class members fully performed their obligations under their contracts with Defendants.

173. However, Defendants did not secure, safeguard, and/or keep private Plaintiff's and Class members' Private Information, and therefore Defendants breached its contracts with Plaintiff and Class members.

174. Defendants allowed third parties to access, copy, and/or exfiltrate Plaintiff's and Class members' Private Information without permission. Therefore, Defendants breached the Privacy Policy with Plaintiff and Class members.

175. Defendants' failure to satisfy its confidentiality and privacy obligations, specifically those arising under the FTCA, HIPAA, and applicable industry standards, resulted in Defendants providing to Plaintiff and Class members that were of a diminished value.

176. As a result, Plaintiff and Class members have been harmed, damaged, and/or injured as described herein, including in Defendants' failure to fully perform its part of the bargain with Plaintiff and Class members.

177. As a direct and proximate result of Defendants' conduct, Plaintiff and Class members suffered and will continue to suffer damages in an amount to be proven at trial.

178. In addition to monetary relief, Plaintiff and Class members are also entitled to injunctive relief requiring Defendants to, inter alia, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide credit monitoring and identity theft insurance to Plaintiff and Class members for a period of ten years.

**COUNT III**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and Class Members)**

179. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

180. This Claim is pleaded in the alternative to Count II above.

181. When Plaintiff and Class members provided their Private Information to Defendants in exchange for Defendants' for services, they entered into implied contracts with Defendants pursuant to which Defendants agreed to reasonably protect such information.

182. Defendants solicited, offered, and invited Class members to provide their Private Information as part of Defendants' regular business practices. Plaintiff and Class members accepted Defendants' offers and provided their Private Information to Defendants.

183. In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

184. Plaintiff and Class members paid money to Defendants with the reasonable belief and expectation that Defendants would use part of its earnings to obtain adequate data security. Defendants failed to do so.

185. Plaintiff and Class members would not have entrusted their Private Information to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

186. Plaintiff and Class members would not have entrusted their Private Information to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

187. Plaintiff and Class members fully and adequately performed their obligations under the implied contracts with Defendants.

188. Defendants breached its implied contracts with Class members by failing to safeguard and protect their Private Information.

189. As a direct and proximate result of Defendants' breach of the implied contracts, Class members sustained damages as alleged herein, including the loss of the benefit of the bargain.

190. Plaintiff and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

191. Plaintiff and Class members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class members.

**COUNT IV**
**Breach of Third-Party Beneficiary Contract**
**(On Behalf of Plaintiff and Class Members)**

192. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

193. Plaintiff and the Class Members are third-party beneficiaries of the contracts between Marquis and FNB, and/or other providers, under which Marquis and/or FNB received Plaintiff's and Class Member's Private Information; stored that information in its computer network systems; and provided billing and collection services to their service providers.

194. Plaintiff and the Class Members, as Marquis's and/or FNB's customers or other parties in contract with Marquis, were the intended beneficiaries of these contracts, in that the

contracts all related to the provision of services to Plaintiff and the Class.

195. Defendants have breached the foregoing contracts by failing to adequately protect Plaintiff's and Class Member's Private Information, resulting in the Data Breach, and injury-in-fact and damages.

196. Defendants materially breached the contract(s) each had entered into by failing to safeguard the Private Information entrusted to it, for failing to ensure its service providers safeguarded Plaintiff's and the Class Member's Private Information, and including breaches of the covenant of good faith and fair dealing.

197. As a direct and proximate result, Plaintiff and Class Members are entitled to actual, compensatory, and consequential damages.

198. Defendants' failure to secure Plaintiff's and Class members' Private Information is ongoing, in that it still holds Plaintiff's and Class members Private Information in an unsafe and unsecure manner.

199. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

200. Plaintiff realleges and incorporates by reference all the preceding allegations above as if fully alleged herein.

201. Plaintiff brings this claim individually and on behalf of the Class in the alternative to Plaintiff's contractual based claims pursuant to Fed. R. Civ. P. 8.

202. Upon information and belief, Defendants funds its data security measures utilizing payments made by or on behalf of Plaintiff and the class members.

203. As such, a portion of the payments made by or on behalf of Plaintiff and the class members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

204. Plaintiff and class members conferred a monetary benefit on Defendants. Specifically, they purchased financial services from Marquis and/or FNB, or its agents and in so doing provided Defendants with their PII. In exchange, Plaintiff and class members should have received from Defendants the goods and services that were the subject of the transaction and had their PII protected with adequate data security.

205. Defendants knew that Plaintiff and class members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Plaintiff's and Class members' PII for business purposes.

206. In particular, Defendants enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and class members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead elected to increase its own profits at the expense of Plaintiff and class members by utilizing cheaper, ineffective security measures. Plaintiff and class members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite security.

207. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and class members, because Defendants failed to implement appropriate data management and security measures that are mandated by its

common law and statutory duties.

208. Defendants failed to secure Plaintiff and class members' PII and, therefore, did not provide full compensation for the benefit Plaintiff and class members provided.

209. Defendants acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

210. If Plaintiff and class members knew that Defendants had not reasonably secured their PII, they would not have agreed to provide their PII to Defendants.

211. Plaintiff and class members have no adequate remedy at law.

212. As a direct and proximate result of Defendants' conduct, Plaintiff and class members have suffered and will continue to suffer other forms of injury and/or harm.

213. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and class members, proceeds that it unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and class members overpaid for Defendants' services.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendants and that the Court grant the following:

A. For an Order certifying the Nationwide Class and the Class and appointing Plaintiff and their Counsel to represent such Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Plaintiff's and Class members' PII, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Plaintiff's and Class members' PII;

v. prohibiting Defendants from maintaining the Plaintiff's and Class members' PII on a cloud-based database;

vi. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x. requiring Defendants to conduct regular database scanning and securing checks;

xi. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendants' policies, programs, and systems for protecting

personal identifying information;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Dated: December 8, 2025

Respectfully submitted,
*/s/ William B. Federman*

William B. Federman
Tex. Bar No. 00794935
Jessica W. Wilkes
**FEDERMAN & SHERWOOD**
4131 N. Central Expressway, Ste. 900
Dallas, TX 75204
T: (800) 237-1277
E: wbf@federmanlaw.com
E: jaw@federmanlaw.com

Marc H. Edelson*
Liberato P. Verderame*
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
T: (215) 867-2399
E: medelson@edelson-law.com
E: lverderame@edelson-law.com

* *Pro Hac Vice* anticipated

*Counsel for Plaintiffs and the Proposed Class*